# OIL, GAS AND MINERAL LEASE L0223419

THIS AGREEMENT executed and effective as of this __24th__ day of _____April_____, __2009__, by and between **Jewel Williams, a single woman of age,** whose mailing address 11528 Morton Rd., Keithville, Louisiana 71047 Lessor (whether one or more), and **CHESAPEAKE LOUISIANA, L.P.**, P. O. Box 18496, Oklahoma City, Oklahoma 73154, as Lessee.

WITNESSETH:

1. Lessor in consideration of One Hundred and No/100 Dollars ($100.00) and other valuable considerations, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purposes of investigating, prospecting, drilling, mining and exploring (including the exclusive right to conduct geophysical/seismic operations and other related activities) for and producing oil, gas and all other minerals, laying pipe lines, building drill sites, access roads, tanks, power stations, telephone lines, and other structures thereon to produce, save, take care of, treat, transport and own said products and for dredging and maintaining canals, constructing roads and bridges, and building houses for its employees, and, in general, for all appliances, structures, equipment, servitudes and privileges which may be necessary, useful or convenient to or in connection with any such operations conducted by Lessee thereon, or on any lands pooled therewith, the following described land in _____Caddo_____ Parish, Louisiana, to-wit:

## TOWNSHIP 15 NORTH, RANGE 16 WEST

**SECTION 28:** The North Half of the Northeast Quarter of Section 28, Township 15 North, Range 16 West, LESS AND EXCEPT a strip of land 80 feet wide lying in Section 28, Township 15 North, Range 16 West, and being more fully described as follows:
The centerline of said 80 feet strip of land begins at a point on the North side of said section 1880 feet more or less West of the Northeast corner of said section and extends South 58 Degrees 10 Minutes West for a distance of 900 feet more or less to the West side of grantors property. All being part of a survey made by the Parish Engineer in January 1933 and known as Johns Gin Road Extension

**It is the intent and purpose of the Lessor to lease all property owned in Section 28, Township 15N, Range 16W, Caddo Parish, Louisiana, whether properly described or not.**

### SEE "EXHIBIT A" ATTACHED TO AND MADE A PART HEREOF FOR ADDITIONAL PROVISIONS

This lease shall also extend and apply to any interest in the lands described herein which Lessor may hereafter acquire, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise.

This lease also covers and includes any other land owned by the Lessor in the above mentioned Section or Sections, all property acquired by prescription and all accretion or alluvion attaching to or forming a part of said land; as well as any interest in any streets, alleys, lanes, roads, streams, bayous, railroads, ditches, canals or other rights-of-way, public, private or abandoned, adjoining or traversing the lands described herein, whether or not specifically described or not. Whether or not any reduction in payment shall have previously been made, this lease, without further evidence thereof, shall immediately attach to and affect any and all rights, titles, and interest in the above described land, including reversionary mineral rights, hereafter acquired by or inuring to Lessor and Lessor's successors and assigns.

For the purposes hereof, the land described herein is estimated to comprise of __78.35__ acres, whether it actually comprises more or less.

2. Subject to the other provisions herein contained, this lease shall be for a period of five (5) years from this date (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

3. For the consideration herein above recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, _____1/5th_____ of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of _____1/5th_____ of the gas so sold or used, provided that on gas sold at the wells the royalty shall be _____1/5th_____ of the amount realized from such sale, such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph; (c) on all other minerals mined and marketed, _____1/5th_____, either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5. If Lessee during or after the primary term should drill or operate a well capable of producing gas or gaseous substances in paying quantities, on the lands described above or on lands pooled therewith and should Lessee be unable to produce said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty One and No/100 Dollars ($1.00/acre) per acre per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation. If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due on or before the expiration date of the primary term herein fixed. Thereafter, Lessee's rights may be continued from year to year by making annual payments in the amount stated on or before the anniversary date of the completion or the shut-in of said well (if completed or shut-in after the primary term), or the end of the primary term (if completed prior thereto), as the case may be; each of such payments to extend Lessee's rights for one year. It is provided, however, that in no event shall Lessee's rights be so extended by annual payments herein fixed without drilling operations or the production of oil, gas or some other mineral for more than five (5) years beyond the end of the primary term hereinabove fixed. The annual payments herein provided for may be deposited to Lessor's Credit in the <u>Pay Direct to Lessor at Address Above</u> which bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the land or mineral rights therein. The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty. The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed or shut-in on a drilling or operating unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6. If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a dry hole or holes on the land described above or on land pooled therewith, without having previously drilled a well which then produced in paying quantities, or if production previously secured should cease from any cause within this ninety (90) day period, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling or reworking thereon, or if production previously secured should cease from any cause after the expiration of the primary term this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling or reworking with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

061209

7. Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, at any time and from time to time, to combine, pool or unitize the land, royalty, or mineral interests covered by this lease, or any portion thereof, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person or corporation so as to create, by the combination of such lands and leases, one or more operating units, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres [except in the event of a horizontal oil or gas completion, in which event such unit may embrace as much as one thousand nine hundred twenty (1920) acres], and in the case of oil, including casinghead gas, (other than a horizontal oil or gas completion) embrace more than forty (40) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate greater than six hundred forty (640) acres, [or, in the case of a horizontal oil or gas completion, greater than one thousand nine hundred twenty (1920) acres], or in the case of oil or casinghead gas which is not a horizontal oil or gas completion, greater than forty (40) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than the unit or the acreage in the spacing rule so permitted or prescribed. The term "horizontal completion" means an oil or gas well in which the horizontal component of the gross completion interval in the reservoir exceeds the vertical component thereof. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten percent in excess of any drilling or operating unit authorized herein. The commencement of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate, or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease. Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument, supplemental thereto re-designating same, as the case may be. Any unit formed by Lessee hereunder may be created either prior to or during or after the drilling of the well, which is then or thereafter becomes the unit well. The failure of the leasehold title (in whole or in part) to any tract or interest therein included in a pooled unit shall not affect the validity of said unit as to the tracts or interests not subject to such failure. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom, Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit. The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns. In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units or out of the shut-in royalty provided for above, subject to the provisions of Paragraph 8, such portion of the royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8. If Lessor owns a less interest in the above described land than the entire mineral estate therein, then the royalties herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole mineral estate.

9. Lessee shall have the exclusive right to explore the land herein described by geological, geophysical or other methods, whether similar to those herein specified or not and whether now known or not, including the drilling of holes, use of torsion balance, seismograph explosions, magnetometer, or other geophysical or geological instruments, tests or procedures, for the purpose of securing geological and geophysical information. All information obtained by Lessee as a result of such activity shall be the exclusive property of Lessee, and Lessee may disseminate or sell such information without Lessor's consent. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises, or on any adjoining lands, as may be reasonable necessary for such purpose, including but not limited to the drilling of wells, construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport oil, gas and other substances. Lessee shall have free use of oil, gas, casinghead gas, condensate, and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land without Lessor's consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within one hundred fifty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

10. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, rentals, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, rentals or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. In the event of an assignment of this lease as to a segregated portion of said land, or as to an undivided interest therein, the rentals payable hereunder shall be apportioned as between the several leasehold owners ratably according to the surface area of each, or according to the undivided interest of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder and, if Lessee or assignee of part or parts hereof shall fail or make default in the payment of the proportionate part of the rentals due from such Lessee, or assignee, or fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee thereof shall make payment of said rentals.

11. In case of suit, adverse claim, dispute or question as to the ownership of the rentals or royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such rentals or royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12. In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or, in the absence of such rulings, forty (40) acres around each such well in as near a square or rectangular form as practicable, and in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13. When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, ordinance, rule, regulation, requisition or necessity of the government, federal, state or municipal, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14. It is expressly understood and agreed that the premises leased herein shall, for all the purposes of this lease, be considered and treated as owned in indivision by the Lessor and shall be developed and operated as one lease, and there shall be no obligation on the part of Lessee to offset wells on separate tracts into which the land covered by this lease may be now or hereafter divided by sale, or otherwise, or to furnish separate measuring, or receiving tanks, and all rentals, royalties and other payments accruing hereunder shall be treated as an entirety and shall be divided among and paid to Lessor in the proportion that the acreage (mineral rights) owned by each bears to the entire leased acreage. Lessee may at any time or times pay or tender all sums accruing hereunder to the joint credit of Lessor.

15. Notwithstanding the death of any party Lessor, or his successor in interest, the payment of tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16. Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right of subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made. In the event the leased lands are encumbered by a mortgage, then prior to the payment of any royalties due hereunder, Lessor agrees to obtain a subordination of mortgage, at Lessor's expense, in a form acceptable to Lessee.

17. Lessee shall pay for actual damages caused by its operations to growing crops and timber on said land leased herein. Lessor specifically agrees that the obligations and liabilities of the Lessee and its successors and assigns for reclamation, restoration, repair or maintenance of the surface or subsurface of the leased premises shall never exceed the fair market value (determined as of the effective date hereof) of the lands covered by this lease, or the portion thereof, for which such reclamation, restoration, repair or maintenance is required.

18. In the event that this Lessor, during the primary term of this lease, receives a bona fide offer which Lessor is willing to accept from any party offering to purchase from Lessor a lease covering any or all of the substances covered by this lease and covering all or a portion of the land described herein, with the lease becoming effective upon expiration of this lease, Lessor hereby agrees to notify Lessee in writing of said offer immediately, including in the notice the name and address of the offeror, the price offered, and all other pertinent terms and conditions of the offer. Lessee, for a period fifteen days after receipt of the notice, shall have the prior and preferred right and option to purchase the lease or part thereof or interested therein, covered by the offer at the price and according to the terms and conditions specified in the offer.

19. This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

20. For the same consideration recited above, Lessor hereby grants, assigns and conveys unto Lessee, its successors and assigns, a perpetual subsurface well bore easement under and through the leased premises for the placement of well bores (along routes selected by Lessee) from oil or gas wells the surface locations of which are situated on other tracts of land not covered hereby and which are not intended to develop the leased premises or lands pooled therewith and from which Lessor shall have no right to royalty or other benefit. Such subsurface well bore easements shall run with the land and survive any termination of this lease.

**DISCLAIMER OF REPRESENTATIONS:** Lessor acknowledges that oil and gas lease payments, including but not limited to bonus and royalty, are market sensitive and may vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor understands that these lease payments and terms are final and that Lessor entered into this lease without duress or undue influence. Lessor recognizes that lease values could go up or down depending on market conditions. Lessor acknowledges that no representations or assurances were made in the negotiation of this lease that Lessor would get the highest price or different terms depending on future market conditions. Neither party to this lease will seek to alter the terms of this transaction based upon any differing terms which Lessee has or may negotiate with any other lessors/oil and gas owners.

IN WITNESS WHEREOF, this instrument is executed effective as of the date first above written.

**WITNESSES**

_Ann Vines_
(signature of first witness)

_Ann Vines_
(name of 1st witness-please print)

_Kenneth D. Nolbit_
(signature of 2nd witness)

_Kenneth D. Nolbit_
(name of 2nd witness-please print)

**LESSOR**

_Jewel J. Williams_
Jewel Williams

**WITNESS ACKNOWLEDGMENT**

STATE OF LOUISIANA

PARISH OF CADDO

Before me, the undersigned authority, personally came and appeared **Kenneth D. Nolbitt** who being first duly sworn deposes and says that he was one of the subscribing witnesses to the execution of the foregoing instrument by **Jewel Williams, a single woman of age,** who signed the same in his presence and that of the other subscribing witness (es) to such signature(s) whose name(s) (signatures) are affixed as such, and that he now recognizes all said signatures to be true and genuine.

_Kenneth D. Nolbit_
Witness signature

Sworn to and subscribed before me, notary, on this _____ day of _____, 2009.

_____
NOTARY PUBLIC in and for _____ Parish, Louisiana

SUSAN D. WILSON, NOTARY PUBLIC
CADDO PARISH, LOUISIANA
MY COMMISSION IS FOR LIFE
NOTARY ID # 26983

**EXHIBIT "A"**

**Attached hereto and made a part of that certain Oil and Gas Lease dated 4/24,2009, by and between Jewel Williams, a single woman of age, as Lessor, and CHESAPEAKE LOUISIANA, L. P., as Lessee.**

1) Notwithstanding anything contained in this lease to the contrary, in the event a portion or portions of the land herein leased is pooled or unitized in any manner with other lands so as to form a pooled unit or units, operations on or unit production from such unit or units shall maintain this lease in force beyond the primary term only as to the land included in such unit or units.

2) Notwithstanding anything contained in this lease to the contrary, this lease shall only cover minerals which can be removed through a well bore.

3) Lessor or its assigns shall reimburse Lessor for the reasonable value of any growing crops destroyed by Lessee's operations hereunder, moreover, Lessee or its assigns shall also reimburse Lessor for the reasonable value of damages to the surface of the leased premises, which damages have been caused by Lessee's unreasonable use thereof or negligence thereon; and Lessee or its assigns agree to fill and level all slush pits in the manner prescribed under Louisiana Office of Conservation rules and procedures, within a reasonable length of time after the abandonment of the use of such pits. Lessee agrees to maintain and repair any roads on the leased premises which it uses during its operations. Lessee further agrees to reasonably restore any portion of Lessor's surface, not requested to be retained by Lessor, within a reasonable time after all wells on the leased premises have been properly plugged and abandoned.

4) Notwithstanding anything contained in this lease to the contrary, one (1) year after the expiration of the primary term of this lease, upon the expiration of any extension, or after cessation of operations as provided herein, whichever occurs last, Lessee shall release all rights lying below the stratigraphic equivalent of one hundred feet (100') below the base of the deepest producing formation in any well drilled on the leased premises or on lands with which the leased premises has been pooled or unitized.

Signed for Identification

*Jewel J. Williams*
Jewel Williams